# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

_____

DAVID LEE JOHNSON and BRENDA
JOHNSON, individually and as the
Wrongful Death Co-Representatives of
Hunter Lee Johnson, Deceased; and as the
Duly appointed Administrators of the
Probate Estate of Hunter Lee Johnson,
Deceased,

        Plaintiffs,

   vs.

THE BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY
OF LARAMIE, WYOMING, et al.,

        Defendants.

Case No. 2:17-CV-0209-SWS

---

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

This matter comes before the Court on *Defendants Laramie County, Wayne Graves, Glenna Hansen and Russell Martens' Motion for Summary Judgment* (ECF No. 92) and the *Individual Defendants' Motion for Summary Judgment* (ECF No. 94). The Court, having considered the briefs and materials submitted in support of the motions and Plaintiffs' responses thereto, having heard oral argument of counsel and being otherwise fully advised, FINDS and ORDERS as follows:

### BACKGROUND

In July 1999, at the request of then-Sheriff of Laramie County Roger Allsop following two incidents of suicide in the Spring of that year, Judith Cox conducted an independent review and critique of the suicide prevention practices at the Laramie County jail. (*See* "Cox Report" at 1, Pls.' Ex. 3-8, ECF No. 102-1.) The Cox Report set forth a number of recommendations, including:

- Implement suicide screening protocol using essential suicide screening indicators. *Id*. at 3.

- Continuous observation of suicidal inmates or, if insufficient staff available, house inmate in a dormitory and check every 10-15 minutes until an assessment of suicide intent by a qualified mental health staff member determines the inmate is not suicidal. *Id*. at 3, 4.

- Collaboration between medical and mental health staff and security personnel to facilitate an interdisciplinary approach to tracking high risk suicidal inmates. *Id*. at 4.

- Implement a protocol to encourage outside agencies and families to report an inmate's suicide risk and to consult with an inmate's treating mental health professional if he/she is receiving mental health treatment. *Id*.

- Enhanced suicide risk training of security personnel and nurses. *Id*. at 4-5.

- Improved communication between medical and mental health staff. *Id*. at 5.

- Mental health services should be made visible and have routine hours of operation; increase mental health treatment, planning and follow-up time for inmates with special needs; expand mental health assessments to include a history of psychiatric care, current psychotropic medications, history of suicidal ideation and behavior, and drug or alcohol usage, and psychiatric consultation in treatment planning decisions. *Id*. at 6.

Presently, the Laramie County Sheriff's Department ("LCSD") has a policy entitled "Medical Program Objectives" (Policy No. 08.18) which provides: "Inmates will not be denied necessary medical services for a serious medical need; medical, dental and

mental health matters involving clinical judgments are the sole provinces of the jail physician, dentist and psychiatrist or qualified psychologist respectively." (Pls.' Ex. 3-5-B, ECF No. 101-8 at 27.)   Further, LCSD has a written policy that covers suicide prevention, intervention, and behavior watch procedures, which was in effect in 2015. (Ind. Defs.' Ex. 1, ECF No. 95-1) ("Suicide Policy").   As the Suicide Policy states, all new inmates are to be screened at intake "for current suicidal ideations, a history of suicide attempts, and a history of mental health counseling."   *Id*. at 1.   Inmates who are actively having suicidal ideations are placed on a 15-minute watch in a central-booking cell.   *Id*. at 1, 2.   The inmate will be placed in a safety smock and a watch log will be initiated.   *Id*. at 2.   The jail's mental health staff will then be notified.   *Id*. at 3.   Only the mental health staff can end or modify a 15-minute watch.   *Id*. at 5.   When the mental health staff does so, the inmate will be placed on a 30-minute watch for at least 48 hours. *Id*.   And only a member of the mental health staff can end or modify a 30-minute watch and allow the inmate's regular housing assignment.   *Id*. at 6.

Laramie County Detention Center ("LCDC") staff receives a variety of training related to the Suicide Policy and mental health risks generally.   The jail captain, Michael Sorenson, has attended formal trainings from national agencies regarding suicide prevention in jails and also receives and reviews monthly email updates from those agencies.   (Sorenson Dep. 22:11-14, 23:14-21, 24:1-9, Ind. Defs.' Ex. 9.)   All deputes upon hiring complete a three-and-a-half-week orientation program that includes classes on suicide prevention.   *Id*. at 25:21-26:3. The new hires then complete an eight-week field training program, where a deputy who has already completed the training instructs

the new hire by example, and this process covers the jail's Suicide Policy. *Id*. at 26:20-21, 27:12-28:1, 28:20-29:23. Additionally, all jail staff receives an annual training on mental health risks and suicide prevention. *Id*. at 30:14-25. This annual mental health training purposely occurs sometime in the fall, prior to the holidays, because that is a "high-stress" time for people, especially for those arrested and separated from families. *Id*. 59:13-21; H. Johnson Dep. 7:10-8:10, Ind. Defs.' Ex. 11.

There have been suicides in LCDC before; though, in the 16-plus years that Defendant Danny Glick has been Sheriff, there have been fewer than ten. (Glick Dep. 5:17, 46:6-14, Ind. Defs.' Ex. 10.) Five of those occurred in 2015 and 2016. *Id*. at 46:15-17. But, there have been many more attempted suicides that were successfully stopped through some form of prevention or intervention. *See id.* at 46:21-23, 54:4-15; Sorensen Dep. 22:5-10 (25 to 30 attempted suicides annually); H. Johnson Dep. 15:5-16:16; Weiland Dep. 16:22-18:12, Ind. Defs.' Ex. 12.

Defendant Wayne Graves is the Mental Health Services Coordinator for LCSD. His responsibilities are "to plan, direct, manage, and deliver psychological services with all components of Laramie County Government, but primarily with staff and Inmates of the Laramie County Sheriff's Department." (Pls.' Ex. 3-5-B, ECF No. 101-8.) His essential duties include coordination of psychological services to LCDC inmates with primary focus on providing mental health services to jail staff and inmates, providing psychological services to inmates, and assessment and management of inmates with active suicidal behaviors. *Id*. at 1.

4

In December of 2015, LCDC mental health staff consisted of Glenna Hansen and Russ Martens, who Graves supervised. Graves has a Master of Social Work degree and is a Licensed Clinical Social Worker. (Graves Dep. 9:2-3, 11:21-12:7, County Ex. 13.) Martens has bachelor's degrees in psychology and sociology and a master's degree in clinical psychology. (Martens Dep. 7:9-22, County Ex. 12.) Prior to working at LCDC, Martens worked for ten years at the Arapahoe County Jail in Arapahoe County, Colorado as a classification officer and member of the mental health staff. *Id*. at 8:9-9:9. At the time relevant to these proceedings, Martens was working as a provisionally licensed professional counselor under the supervision of Graves and other private clinical supervisors. *Id*. at 11:7-25; Graves Dep. 28:16-32:16. Hansen has a master's degree in counselor education and is a licensed mental health counselor. (Hansen Dep. 9:2-6, Pls.' Ex. 10.)

On Friday, December 18, 2015, 19-year-old Hunter Johnson, believing he was going to start outpatient treatment for alcohol the following Monday, went out for a "last hurrah." (D. Johnson Dep. 59:17-60:10, County Ex. 1, ECF No. 93-1.) At approximately 1:23 a.m. on Saturday, December 19, 2015, Cheyenne Police Department ("CPD") officers JoAnne Young and Lisa Koeppel responded to a call at the Walmart in Cheyenne where an intoxicated Hunter was causing a disturbance. (Young Dep. 16:22-17:8, County Ex. 2; CPD Incident Report, County Ex. 3.) Hunter's parents, David and Brenda Johnson, were also present at the Walmart having been notified by a third party of Hunter's whereabouts. (D. Johnson Dep. 57:16-24.) Hunter's parents were observing Hunter, who was inside the Walmart, from the entrance vestibule, when Officers Young

and Koeppel arrived. *Id*. at 57:25-59:11. David Johnson told the officers about Hunter's alcohol and depression issues and warned them they might need backup to arrest his son. *Id*. at 59:12-60:18.

When the officers made contact with Hunter inside the Walmart, he was informed he was under arrest, he resisted, and he was taken to the ground and handcuffed. (Young Dep. 17:7-18:5.) A bottle of beer was found in his coat pocket. (Young Dep. 18:6; County Ex. 3.) As the officers escorted Hunter from the Walmart, Hunter saw his parents and began to curse and yell at them. (Young Dep. 18:23-25; County Ex. 3.) Once outside, Hunter again began resisting and tried to get away from the officers, at which point he was taken to the ground a second time. (Young Dep. 18:25-19:15; County Ex. 3.) Hunter, again cursing and yelling at his parents, continued to resist the officers by kicking his legs violently. (Young Dep. 23:17-27:21; County Ex. 3.) At about this point during the altercation, Hunter indicated he was suicidal and demanded he be taken to the hospital. (Young Dep. 28:4-18.) Eventually, Hunter was restrained using a WRAP device and placed in a patrol car. *Id*. at 33:1-2. Hunter then forcefully banged his head against the door window of the patrol car two to four times so he was placed in a sparring helmet. *Id*. at 33:5-19, 37:13-38:13; County Ex. 3. Because Hunter continued to hit his now padded head against the window, he was removed from the patrol car for eventual transport to the LCDC by ambulance strapped to a gurney. (Young Dep. 33:17-24, 41:9-22; County Ex. 3.) While waiting for the ambulance, David Johnson informed the arresting officers his son had been subject to previous emergency detentions. (Young Dep. 28:25-30:22, 41:23-42:8, 43:7-19.) Hunter was charged with breach of the peace,

interference with a peace officer, and being a minor under the influence of alcohol. (County Ex. 3.)

Hunter was booked into LCDC at approximately 2:30 a.m. December 19, 2015. (Laramie County Sheriff's Department Strip Search Report, County Ex. 5.) At that time, he signed a form authorizing the release of his health care information from Cheyenne Regional Medical Center. (Pls.' Ex. 3-4, ECF No. 101-6 at 212.) The arresting officer, Jo Young, completed the upper portion of LCDC's "Inmate Screening Form" indicating Hunter had made suicidal statements and informed the detention center booking officer, Deputy Kemp, of the same. (Young Dep. 56:24-59:8, 64:18-65:23; County Ex. 6.) Deputy Kemp placed Hunter in a safety suit, put him on a 15-minute close watch, and notified the mental health staff of the situation.[1] (Close Watch Report, County Ex. 7, ECF No. 93-7 at 6; Kemp Dep. 32:4-9, County Ex. 4.) Hunter was observed every 12-13 minutes until he was cleared from the 15-minute watch at 1:11 p.m. that same day by LCDC mental health staff member Russell Martens, who noted Hunter denied any suicidal ideations. (County Ex. 7 at 8-10 (watch log), 18.)

During this December 19th meeting with Martens, Hunter further *denied ever telling the arresting officer he was suicidal* and *denied any history of suicidal ideations*. (Martens' notes, Ind. Defs.' Ex. 5.) Hunter acknowledged his misbehavior during his arrest and asked how long he would have to be in jail, because he was scheduled to start

---

[1] Brenda and David Johnson dropped off medications for Hunter sometime in the morning of December 19th, possibly around 9:00 or 10:00. (B. Johnson Dep. 72:15-20, County Ex. 9; D. Johnson Dep. 65:10-24; County Ex. 10 at 15.) While both Brenda and David Johnson claim to have informed jail staff (specifically, a member of the medical staff) of Hunter's problems, neither can recall who they talked to nor can they recall the specific information they shared with the jail staff. (D. Johnson Dep. 63:23-64:17; B. Johnson Dep. 72:25-73:12.)

rehab in a week. *Id*. Hunter also asked for normal clothes and a phone call. *Id*. Martens found Hunter to be "future oriented," polite, and cooperative. *Id*. Martens cleared Hunter from the 15-minute watch, placed him on a 30-minute follow-up watch, and approved him for regular clothes. *Id*. (*See also* Martens Dep. 22:2, Ind. Defs.' Ex. 15; Ind. Defs.' Ex. 4 at 11-16 (second watch log); Kemp Dep. 45:3-14, 46:10-15; Pls.' Ex. 31-13 at 40.)

Two days later, on December 21, 2015, at approximately 2:56 p.m., Glenna Hansen interviewed Hunter and removed him from the suicide watch. (Hansen's Progress Notes, Ind. Defs.' Ex. 6 at 3.) Hansen recorded the following from her interview:

> Inmate Johnson was on a 30 min follow-up watch. He presented as groggy as he had just woken up. He reported that he was coping with his situation. His court got moved to tomorrow and he hopes he gets out then. He *denies suicidal ideation* and denies any difficulty eating or sleeping. He is future-oriented. Inmate Johnson presented as stable, no SI. Discontinue watch, schedule for follow-up visits.

*Id*. (emphasis added). Although Hunter had a history of mental health issues, Hansen testified an inmate's mental health history is not the decisive factor; the determination whether to end a mental health watch is based on the inmate's "current situation, current behavior, [and] current statements." (Hansen Dep. 79:10-11, Ind. Defs.' Ex. 16.) "We can't say . . . a person was suicidal last week, so we have to keep them on a watch[.]" *Id*. at 79:12-14. Given her meeting with Hunter, Hansen felt it was appropriate to end Hunter's 30-minute watch and allow him to be placed in a regular cell. (Hansen Dep. 65:13-66:19; Ind. Defs.' Ex. 4 at 11, 16.) However, while Hunter was taken off a 30-

minute *mental health* watch, the jail's medical staff had separately put Hunter on a 30-minute *medical* watch for alcohol withdrawal. (Stephens Dep. 60:13-16, Ind. Defs.' Ex. 17.)

The next day, December 22, 2015, Hunter appeared in Circuit Court for his initial hearing on the charges stemming from his December 19th arrest. (Davis Dep. 15:3-14, Ind. Defs.' Ex. 20.) Brian Davis and Jesse Ward were sheriff's deputies working court security that day. *Id.* Near the end of the hearing, Hunter told the judge he wanted to go home. (Ward Dep. 13:18-20, Ind. Defs.' Ex. 21.) He then turned away from the judge and began moving toward the door as if he was going to walk out of the courtroom, rather than go to the courtroom holding area that led back to the jail. (Ward Dep. 13:20-22; Davis Dep. 19:15-20:5.) Davis intercepted Hunter, put his hand on Hunter's arm, and escorted him back to the holding area. (Davis Dep. 20:6-17; Ward Dep. 14:3-7.) Hunter was "kind of pulling against" Davis as the two went back to the holding area. (Ward Dep. 14:8-9.) Ward followed them into the holding area to assist. *Id.* at 14:10. At that point, Hunter began wrestling with the officers. *Id.* at 15:22-16:11. After a struggle, the deputies were able to get Hunter on the ground and handcuffed. *Id.* at 16:11-21, 25:12-14. Hunter was helped to his feet but continued to pull away, so Davis employed a wristlock to gain compliance. *Id.* at 17:7-14. The deputies escorted Hunter back to the jail, to a holding cell in booking, and then returned to the courtroom. *Id.* at 17:19-18:8. Neither deputy considered Hunter's actions suicidal. (Davis Dep. 36:18-24; Ward Dep. 27:25-28:14.) Davis had put inmates on a suicide watch "easily . . . a couple hundred times." (Davis Dep. 36:6-12.) As Ward explained:

> I saw outward anger. I saw it directed toward us. And I've seen that before
> with other inmates. And other people that did not like the results that they
> got from the judge. And that did not result in a suicide attempt. But I saw
> outward anger . . . directed toward us, not what I would consider an inner
> anger that's self-directed and/or . . . contemplated self-harm.

(Ward Dep. 28:4-12.)

Jennifer Stephens was the jail's shift supervisor on December 22, 2015 when Hunter returned from court. (Stephens Dep. 48:16, 51:18-21.) Davis "radioed ahead" to Stephens that he was bringing Hunter to B pod; Stephens responded the jail did not have room in B pod, so she advised Davis to take Hunter to booking until she could make some room in B pod. *Id*. at 51:22-52:3. When Hunter and the deputies arrived at booking, Davis explained Hunter had tried to walk out of court and resisted when the deputies tried to put him in handcuffs and escort him back to the jail. *Id*. at 52:5-8. B-pod contains the jail's single occupancy, segregation cells meant for inmates who present a safety and security risk or have attempted an escape. *Id*. at 47:7-12; Martens Dep. 38:18-20. Because there was not an open cell in B-pod when Hunter returned from court, Stephens placed him in a booking cell at approximately 11:01 a.m., until staff could relocate an inmate and open a space. (Stephens Dep. 54:23-24; County Ex. 22, Time Stamp 11:01 a.m.)

Hunter received a sack lunch at about 11:06 a.m. (Pls.' Ex. 34, Holding Cell Video, Time Stamp 11:06 a.m.) At noon, Stephens looked into Hunter's cell and observed him standing on the toilet and putting something into the vent. *Id*. at 12:00:09 p.m. Stephens requested another deputy retrieve the keys and remove all trash from the cell, which was done. *Id*. at 12:00:39. Also at one point, Stephens noticed Hunter was

sitting and crying, so she called mental health staff to check on him and "clear him to go to B pod." (Stephens Dep. 53:2-3, 56:3-5, 60:4-9.) Stephens did not put Hunter on a suicide watch herself because, although Hunter's behavior was concerning enough to involve the mental health staff, it did not necessarily indicate Hunter was suicidal. *Id*. at 61:2-62:6, 71:23-72:9. Stephens advised the mental health staff member who came to talk to Hunter, Russ Martens, that she was planning to put Hunter in B-pod and wanted to get mental health's clearance for that. *Id*. at 75:19-24; Martens Dep. 34:4-7.

Darci Flint-Baker was another deputy working the booking area on December 22, 2015. (Flint-Baker Dep. 7:9-12, 15:5, Ind. Defs.' Ex. 19.) Part of her job was to check on inmates in the booking cells at least twice per hour, but she tended to do her "watch rotations" every 12 to 13 minutes and recalls doing so that day. *Id*. at 16:10, 16:25-17:3, 18:5-6, 21:25-22:18. During those rounds, Deputy Flint-Baker spoke briefly with Hunter; he asked if he was going to court again and when he was going home, but she did not know. *Id.* at 42:7-16, 43:24-25, 44:11-12. Flint-Baker never saw Hunter crying, acting unusual, or appearing upset. *Id*. at 16:16-24, 43:16-18. She was aware Hunter had been on suicide watch earlier and then cleared. *Id*. at 19:14-19, 20:15-21. And she was aware of Hunter's outburst in court. *Id.* at 15:3. She also remembers contacting mental health staff to clear Hunter for B-pod. *Id*. at 25:14-18, 26:8-16, 27:16-19.

Just after noon, Hunter again met with mental health provider Russ Martens while still in a holding cell in the booking area of the jail. (Stephens Dep. 65:7-13; Martens Dep. 33:19-34:34:3.) Martens talked with Hunter for some 22 minutes. (*See* County Ex. 26, Time Stamp 12:03-12:25.) Regarding this meeting, Martens noted:

> Inmate was seen in CBO after he "went off in court" Inmate appeared calm "I don't want to be here" "I told them that they could have a deputy stay in my room at home and I could be released" "I don't think I have a problem" Inmate stated a [history] of bipolar disorder, depression, ADHD. Inmate denied any current [suicidal ideation]. Inmate stated that he cannot read[.] He presents as if he may be developmentally delayed[;] he was in special ed during school. He graduated without being able to read. Inmate appear[s] stable at this time and plans on complying with all further deputy orders. Inmate will notify staff of any emergent needs[.]
>
> Inmate appears appropriately stressed due to current stressors. [H]e does not appear to be making logical decisions for himself, he may be cognitively delayed but it is unclear at this time[.]
>
> Inmate to kite PRN. He will notify staff of needs[.] He will concentrate on good behavior so that he can be released[.]

(Mental Health Progress Notes, Ind. Defs.' Ex. 5 at 12.)[2] Martens explained he noted Hunter was "not making logical decisions" because Hunter

> was using drugs because his friends were using drugs. He was saying he was on medication. And you shouldn't use alcohol or drugs when you're on medication. . . . So, yeah, . . . he just wasn't making good life decisions right then for himself. It didn't seem like he was making logical decisions about that . . . .

(Martens Dep. 35:5-12.) Martens concluded Hunter did not need any additional suicide watch. (Martens Dep. 34:19-24.) Finding "no indication to believe . . . there was any reason to not put [Hunter] in B pod," Martens cleared Hunter for placement into B-pod. *Id.* at 36:24-37:1; Flint-Baker Dep. 28:10-11.

At some time later, Defendant Martens completed an Inmate Behavior Report concerning his December 22nd meeting with Johnson:

---

[2] These Notes were entered into the LCDC system at 1:55 p.m. on December 22, 2015.

I was asked to speak with inmate around 1200 hours by Sgt. Stephens in HC2 in Booking. The reason for this request was that he had "went off" at court.

I spoke to the inmate in his cell initially with Corporal Johnson standing by. The inmate stated, "I told the judge that I wanted out and that he could put me on home arrest or have a deputy sit with me in my room I just wanted go home." We discussed how his behavior in front of the judge had created this most recent situation and that the court wanted to know that he was stable enough to leave the jail and be with his parents and go to treatment; like we had discussed on Saturday. We discussed that the court wanted to see him again at 1400 hours and that was a good thing, because the judge still wanted to see if he could calm down. He then stated, "I talked to you Saturday and I was supposed to go to treatment, but I don't think I have a problem." I stated that he was in jail for using drugs and alcohol so there was a problem. . . .

He then asked if he could speak with me without the deputy . . . . The inmate appeared calm and relaxed. He had good eye contact and wanted to talk further. . . . The inmate wanted to know if he was charged with a felony. . . . I explained that I did not know the circumstances around any legal charges and that I would ask, but that he would be facing discipline time. He asked, "How much time?" I explained that I did not know, but that I would ask to find out . . . . He asked, "Is there any way I can go anywhere else like an A-pod?" I explained that discipline was done in B-pod, but that his focus should be on behaving in court when he went back and hoping that the court would release him. I told him that mental health had books we could give him so that he would be less bored. He stated, "I can't read." When asked how he had achieved his diploma, the inmate stated that he had cheated in high school off of his friends . . . . He stated he took special education classes in school and that he could read a little. We discussed how B-pod was not too bad and that some people liked the time alone, but most people found it to be really boring. I told him that since he could not read very well that we had some books that were less difficult. I asked him to not focus on the B-Pod time and to just focus on having excellent behavior so that when the judge called over to find out how he was doing we could let the judge know his is doing fine. I asked him to behave just like he was with me; to be polite and cooperative with good eye contact. I asked him to prepare himself so that no matter what the judge stated that he would remain calm and collected.

I asked the inmate what his previous mental health diagnosis [were]. He stated, "Bi-polar, depression, and ADHD and maybe something else." I

asked him when was the last time that he took medication for these diagnosis and if they had helped. He stated, "I am on meds now and also the ones for the alcohol withdrawal." I asked him if he felt like they were working and if he felt okay. He stated, "I guess." I asked him if he felt suicidal and he stated "No." I asked him if he did feel suicidal would he be able [to] let a staff member know. He stated, "I will, but is there any way I can come out of this cell and go somewhere else" I told him this was the best spot for him for now and that I thought they would keep him here until they found out what was going to happen at court. He asked, "Is there any way that I can sit out there in those blue chairs?" I told him he would need to stay in his cell until court. I asked him if he felt he could go to court and show the judge that he was calm and collected and that there was no reason for him to be in jail and he stated, "I can, what time it is (sic)?" They should be coming to get me here pretty quick."

I asked Sgt Stephens if he was being charged for his behavior at the court. And she stated that he was not being charged. I asked Sgt Stephens how many days he should expect in B-pod and she states at least 15 days. I went back and spoke with the inmate and told him he was not being legally charged for anything else and that he should expect at least 15 days in discipline. He asked, "Do they ever let you out early for good behavior?" I let him know that he should just focus on behaving at court and that if the judge let him go that he would not be here to do the discipline. He asked, "Can you call my mom and let her know I am going to court at 2:00?" I let him know that I could not call his mom, but that I would let the deputy know that he wanted to make a call. I notified the deputy that he was requesting a phone call.

I spoke with Sgt Johnson around 1425 hours and he stated that the inmate was being released by the court to go to treatment. I went to speak with the inmate in central booking to ask him about his release and pending treatment and I noticed that his cell door HC2 in Booking was open and I assumed the inmate had been released to the community.

(Pls.' Ex. 31-13 at 31-33.)

Video footage later revealed Hunter exhibited suicidal behavior in his booking cell for ten or eleven minutes just before talking to Martens and again for around five to six minutes just before being taken to B-pod. That is, Hunter tied together several plastic baggies or wrappers from his sack lunch, checking a couple times whether he had

sufficient length to go around his neck, then apparently tried attaching the string of plastic baggies to the ceiling vent. (Pls.' Ex. 34, Time Stamp 11:46 a.m.–11:48, 11:51-12:00 p.m.) However, when Deputy Stephens observed him putting something in the vent, he stopped the behavior and put the baggies into the brown paper lunch sack before handing the trash to Deputy Stephens through the cell door slot. *Id*. at 12:00:10-12:00:37. Then again, just before transferring to B-pod, Hunter took off his striped jail shirt, leaving on his black undershirt, and then sporadically tried hanging the shirt from fixtures in the holding cell and putting the shirt over his head, as if to test whether he could hang himself. (*See* Ind. Defs.' Ex. 8, Time Stamp 1:40-1:45:50.) Jail staff would only realize this later, in reviewing the circumstances surrounding Hunter's suicide, by viewing the video footage from Hunter's booking cell.[3] (*See* Stephens Dep. 57:3-14.) Apparent from the video footage is that Hunter concealed his activity or kept a lookout and stopped his suicidal behavior if someone walked by and just before a deputy came to the door. (*See, e.g.,* Pls.' Ex. 34 at 11:46:52, 11:47:09, 11:48:33; Ind. Defs.' Ex. 8 at 1:41:51, 1:43:13, 1:43:51, and 1:45:45.)

At approximately 1:45 p.m., Doug Sipes strip-searched Hunter and escorted him to B-pod.[4] (Flint-Baker Dep. 28:11-13; Ind. Defs.' Ex. 7 at 2-3.) There, Deputy Sipes met

---

[3] The holding cells in booking are equipped with video cameras; however, the cameras are not for monitoring the cells in real time. (Glick Dep. 64:7-15, Ind. Defs.' Ex. 10.) Rather, the cameras provide a means of reviewing an incident after the fact, such as for evidence in defending the use of force against an inmate. *Id*. at 64:3-6; Sorenson Dep. 57:24-58:6, Ind. Defs.' Ex. 9.) Accordingly, the booking cell cameras are recording footage but are not monitored live.

[4] Sipes recalls Hunter having his striped jail shirt off when he escorted him to B-pod. (Sipes Dep. 38:3-7, Ind. Defs.' Ex. 18.) However, this was not a sign of suicidal intent to Sipes, as it was "normal" to see inmates in their cells without their striped shirts on or to be completely shirtless. *Id*. 38:7-11; *see also* Flint-Baker Dep. 62:11-13 (agreeing it is not unusual to see an inmate in his cell with his shirt off).

with one of the pod deputies, Jordan Weiland, and they decided Hunter should be housed on the lower floor since he was on a medical watch for alcohol withdrawal.  (Ind. Defs.' Ex. 7 at 3.)  Sipes then took Hunter to his cell at approximately 1:56 p.m., where Hunter asked, "When is my time out?"  *Id*.; County Ex. 28 (Time Stamp 1:56 p.m.).  Sipes said he didn't know and that Hunter would have to check with the pod officer.  (Ind. Defs.' Ex. 7 at 3.)  Nothing about Hunter's demeanor in going to B-pod suggested suicidal ideations to Sipes.  (Sipes Dep. 38:12-39:3, Ind. Defs.' Ex. 18.)  Sipes then returned to his post in booking.  (Ind. Defs.' Ex. 7 at 3.)

Deputy Weiland was working B-pod that afternoon with a trainee, Landon Henrie. (Weiland Dep. 21:15-16, 23:1-5.)  Within ten minutes of Hunter being placed in his B-pod cell, Deputy Weiland conducted an area check of the entire pod and observed Hunter making his bed.  *Id*. at 34:15-17; County Ex. 28, Time Stamp 2:03:50.  Weiland then "briefed" Deputy Henrie that Hunter had been moved in and that he was on a medical watch.  (Weiland Dep. 35:19-21.)  About ten minutes later, Hunter was visited by a fellow inmate, who communicated with him from outside the cell.  *Id*. at 34:23-24; County Ex. 28 at 2:13:50-2:14:30. Approximately sixteen minutes later, Deputy Henrie, conducting an area check of B-pod, observed Hunter sitting on the floor next to the desk with a bed sheet wrapped around his neck.  (County Ex. 28, Time Stamp 2:29:27 p.m.; Henrie Dep. 11:1-3, County Ex. 30; Ind. Defs.' Ex. 7 at 4.)  Henrie called out for Deputy Weiland and radioed a "10-Medical" in B-pod.  (Ind. Defs.' Ex. 7 at 4.)  LCDC security and medical staff responded immediately and within minutes instigated first-aid and CPR.  (*See* County Ex. 28, Time Stamp 2:29:35-2:39 p.m.)  Hunter was ultimately

transported from the detention center to Cheyenne Regional Medical Center where he later died.

On December 28, 2015, LCSD requested Hunter's medical records from Cheyenne Regional Medical Center. (Pls.' Ex. 3-4 at 91, 99-100.) The medical records show Hunter had been through Emergency Detention and Involuntary Hospitalization Proceedings related to suicide ideations in November of 2015, and the week prior to his arrest on December 19, 2015. *Id*. at 309-334. The LCSD was involved in the December 12, 2015 incident. *See id.* at 2. LCDC mental health staff was not aware of Hunter's history of suicidal ideation or prior involuntary hospitalizations at the time of their interviews with him during his December 19-22, 2015 incarceration. (*See* Hansen Dep. 57:7-25, Pls.' Ex. 10; Martens Dep. 28:22-29:1, 31:21-33:2.)

Plaintiffs filed their First Amended Complaint on December 22, 2017, asserting three causes of action: (1) a claim under 42 U.S.C. § 1983 for alleged deliberate indifference to serious medical needs, inhumane conditions of confinement, and the County and Sheriff's failure to supervise healthcare providers, in violation of Hunter Johnson's substantive due process rights;[5] (2) negligence of health care providers under Wyo. Stat. § 1-39-110; and (3) negligence of peace officers under Wyo. Stat. §§ 1-39-112, 1-39-118(b). Defendants move for summary judgment on all claims, asserting qualified immunity and a lack of evidence supporting Plaintiffs' negligence claims.

---

[5] The parties stipulated to a non-prejudicial dismissal of Plaintiffs' § 1983 official capacity and governmental and supervisory liability claims. (*See* ECF No. 75.) The Court also previously dismissed Plaintiffs' § 1983 claim against Defendant Hansen. (*See* ECF No. 69.)

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal quotations and citations omitted). "The district court must draw all reasonable inferences in favor of the nonmoving party. . . . But an inference is unreasonable if it requires a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility." *Pioneer Centres Holding Co. Employee Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017) (internal quotation and citations omitted).

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Holland v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001), and "public officials who act in good faith, on the basis of objectively reasonable understandings of the law at the time of their actions," *Weigel v. Broad*, 544 F.3d 1143, 1151 (10th Cir. 2008). Because the protection of qualified immunity gives officials an immunity from suit rather than a mere defense to liability, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Holland v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001). *See also Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009).

**DISCUSSION**

**A.      § 1983 Claim for Deliberate Indifference to Serious Medical Needs**

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)) (internal quotations omitted).   When a defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to demonstrate: (1) the defendant's conduct as alleged or shown makes out a violation of a constitutional right; *and* (2) the constitutional right was "clearly established" at the time of defendant's alleged misconduct. *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012); *Pearson*, 555 U.S. at 232.[6]

> A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. ——, ——, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) (internal quotation marks and alteration omitted). "We do not require a case directly on point, but **existing precedent must have placed the statutory or constitutional question beyond debate**." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). . . .   "We have repeatedly told courts ... not to define clearly established law at a high level of generality." *al–Kidd, supra*, at 742, 131 S.Ct. 2074. The dispositive question is "**whether the violative nature of *particular* conduct is clearly established**." *Ibid*. (emphasis added). This inquiry " 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' " *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

*Mullenix*, 136 S. Ct. at 308 (bold emphasis added).

---

[6] A district court has discretion to address these inquiries in the order most appropriate under the particular circumstances at hand. *Pearson*, 555 U.S. at 236.

Though the court must still view the evidence in the light most favorable to the non-moving party, the "record must clearly demonstrate the plaintiff has satisfied [t]his heavy two-part burden[.]" *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877-78 (10th Cir. 2014) (internal quotation marks and citation omitted). If a plaintiff fails to satisfy either part of this burden, the court must grant the defendant qualified immunity. *Holland*, 268 F.3d at 1186.

> Prison and jail officials, as well as the municipal entities that employ them, cannot "absolutely guarantee the safety of their prisoners." *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999). Nonetheless, they "ha[ve] a constitutional duty to take reasonable steps to protect the prisoners' safety and bodily integrity." *Berry v. City of Muskogee*, 900 F.2d 1489, 1499 (10th Cir.1990). "[C]laims based on a jail suicide are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody." *Barrie v. Grand Cty.*, 119 F.3d 862, 866 (10th Cir. 1997). Therefore, such claims "must be judged against the 'deliberate indifference to serious medical needs' test." *Estate of Hocker ex rel. Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994) (quoting *Martin v. Bd. of Cty. Comm'rs*, 909 F.2d 402, 406 (10th Cir. 1990)).

*Cox v. Glanz*, 800 F.3d 1231, 1247-48 (10th Cir. 2015). "Deliberate indifference has objective and subjective components." *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006). The objective component requires the harm suffered be sufficiently serious – suicide qualifies. *Id.*; *see also Cox*, 800 F.3d at 1240 n.3. The subjective component requires a plaintiff to show the defendants "knew [the prisoner] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Callahan*, 471 F.3d at 1159 (internal quotation and citation omitted). This requires inquiry into the officials' *particularized* state of mind (*Cox,* 800 F.3d at 1249) – which

must have been "sufficiently culpable" (*Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Deliberate indifference entails a higher degree of culpability than negligence. *Id*. at 835.

Thus, to succeed on a jail suicide case such as this, the plaintiff must show jail officials were "deliberately indifferent to a *substantial risk of suicide*." *Cox*, 800 F.3d at 1250 (internal quotation and citation omitted) (emphasis added in *Cox*). To be liable, the officials must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also draw the inference." *Cox*, 800 F.3d at 1248 (quoting *Farmer*, 511 U.S. at 837). A factfinder "may conclude that a prison official subjectively knew of the substantial risk of harm by circumstantial evidence or 'from the very fact that the risk was obvious.'" *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) (quoting *Farmer*, 511 U.S. at 842). "However, the Supreme Court has cautioned that an obvious risk cannot conclusively establish an inference that the official subjectively knew of the substantial risk of harm, because 'a prison official may show that the obvious escaped him.'" *Id*. (quoting *Farmer*, 511 U.S. at 843 n.8). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not" is insufficient to satisfy the test for deliberate indifference. *Farmer*, 511 U.S. at 838.

While not sufficient for the second prong of qualified immunity, these general contours of Hunter Johnson's right to be free from deliberate indifference to his serious medical needs inform the analysis of whether Plaintiffs have shown a violation of Hunter's constitutional right. As discussed below, however, none of the Defendants deliberately disregarded Hunter's risk of suicide, nor subjectively knew of that risk when Hunter was placed in B-pod.

### 1.    *Sheriff and Deputies*[7]

The only fact Plaintiffs point to as establishing these Defendants' knowledge of a substantial risk of suicide is that Hunter made suicidal statements when he was arrested. However, in the three days that followed, Hunter had been on a 15-minute watch followed by a 30-minute watch and interviewed by mental health staff three separate times.  The mental health staff members had cleared Hunter from the suicide watches and approved his placement in the segregation cell.  Although Deputy Stephens was aware of Hunter's outburst in court and later saw him crying, such behavior is not so *obviously* indicative of suicidal ideations as to establish Stephens (or any of the other deputies) subjectively knew of a substantial risk of suicide.  Moreover, Hunter was actively hiding his suicidal behavior from the deputies as he waited in his holding cell before going to B-pod.[8]   There is no evidence Hunter engaged in suicidal behavior as he was being transferred to B-pod.  And despite a timely check, Hunter tragically took his own life. Notwithstanding, the LCSD deputies who interacted with Hunter were responsive to Hunter's mental health needs and unaware he was a *substantial* risk for suicide.[9]   Thus, Plaintiffs have failed to show the deputies violated Hunter's constitutional right.

---

[7] Defendants Sheriff Danny Glick and Deputies Jennifer Stephens, Harold Johnson, Brian Davis, Landon Henrie, Jordan Weiland, Doug Sipes, Darci Flint, and Jesse Ward.  These are the deputies who interacted with Hunter Johnson on the day of his suicide, December 22, 2015.

[8] It would be improper to infer knowledge of a substantial risk of suicide from the video evidence of Hunter's suicidal behavior, which was not observed by any of the deputies. *See Gaston v. Ploeger*, 229 F. App'x 702, 711 (10th Cir. 2007) (unpublished).  Jailers do not have a constitutional duty to monitor inmates constantly.  *Id.*  "[J]ailers are neither obligated nor able to watch every inmate at every minute of every day."  *Id.*

[9] Contrary to Plaintiffs' suggestion, it would be improper "to take the suicide, *ipso facto*, as conclusive proof of deliberate indifference."  *Rellergert by Rellergert v. Cape Girardeau Cty., Mo.*, 924 F.2d 794, 796 (8th Cir. 1991).  "[W]here suicidal tendencies are discovered and preventive measures taken, the

As to Sheriff Glick, he was not working in the jail and had no interaction with Hunter leading up to his suicide. Plaintiffs contend Sheriff Glick violated Hunter's right to medical care by a "systemic failure" to make sure the jail's policies are followed and incorporate all the policies and practices recommended by the 1999 Cox Report for dealing with suicidal inmates.[10] Specifically, Plaintiffs contend Sheriff Glick should be providing psychiatric or psychological care and ensuring the jail's mental health staff has access to important information necessary to assess an inmate's risk of suicide, including readily-available involuntary hospitalization records.

In a § 1983 lawsuit,

> "[s]upervisory liability 'allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, [or] implements ... a policy ... which subjects, or causes to be subjected that plaintiff to the deprivation of any rights ... secured by the Constitution.' " *Brown v. Montoya*, 662 F.3d 1152, 1163-64 (10th Cir. 2011) (second alteration in original) (omissions in original) (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010)). This does not equate to "liability under a theory of respondeat superior." *Id*. at 1164; *accord Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). A plaintiff arguing for the imposition of supervisory liability "therefore must show an 'affirmative link' between the supervisor and the constitutional violation." *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (quoting *Schneider*, 717 F.3d at 767).

*Cox*, 800 F.3d at 1248. The requisite showing of an "affirmative link" has three related prongs: "(1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind." *Id*.

---

question is only whether the measures taken were so inadequate as to be deliberately indifferent to the risk. The suicide is not probative of that question . . . ." *Id*.

[10] "The Supreme Court has held that simply failing to follow jail policies is not a constitutional violation in and of itself." *Ernst v. Creek Cty. Pub. Facilities Auth.*, 697 F. App'x 931, 934 (10th Cir. 2017) (unpublished) (citing *Davis v. Scherer*, 468 U.S. 183, 194 (1984)).

Pursuant to LCSD policies, when jail staff learned Hunter had made a suicidal statement, they dressed him in a safety suit, put him on suicide watch, and relied on the mental health professionals to remove him from that watch and approve his placement in B-pod.[11] While suicides had previously occurred in the jail, many others were prevented based on the jail's training, policies, and practices. Plaintiffs have provided no evidence showing how the lack of psychiatric care and/or information about prior suicidal ideations or involuntary hospitalizations caused Hunter's suicide or even contributed to the risk.[12] If anything, the suicide resulted from a lack of more frequent monitoring, which does not amount to deliberate indifference. *See Bame v. Iron Cty.*, 566 F. App'x 731, 739, 741 (10th Cir. 2014.) Moreover, Plaintiffs have failed to establish Sheriff Glick possessed the requisite mental state; i.e., that he knew *Hunter* faced a substantial risk of suicide and disregarded that risk. *See Cox*, 800 F.3d at 1250-52; *Bloom v. Toliver*, 133 F. Supp. 3d 1314, 1327 n.5 (N.D. Okla. 2015) (noting that in jail suicide cases, "the state of mind element is not established in the absence of proof that the supervisor had 'knowledge that the specific inmate at issue' was at substantial risk") (quoting *Cox*, 800 F.3d at 1250).

2.    *Graves and Martens*

Plaintiffs argue Defendant Russ Martens knew Hunter faced a substantial risk of suicide and disregarded that risk by failing to take measures to abate it. Specifically,

---

[11] "[Plantiff] provides no authority (and we are aware of none) for the proposition that an inmate's Eighth Amendment rights are violated if a medical professional other than a licensed physician or psychiatrist makes suicide watch determinations." *Ernst*, 697 F. App'x at 934.

[12] For instance, the record contains no evidence that a psychiatrist or psychologist would have assessed Hunter differently than did Martens, nor any evidence to support a finding that once a person has suicidal ideations he should be deemed a suicide risk indefinitely, regardless of future behavior and indications.

Plaintiffs assert Martens was aware of the following facts from which the inference could be drawn that a substantial risk of suicide existed on December 22, 2015: Hunter had been diagnosed with ADHD, bi-polar disorder, and depression; Hunter had received "bad news" in court and was observed crying in his holding cell; Hunter was thinking illogically and wanted to go home. Plaintiffs contend Martens disregarded this risk by allowing Hunter to be placed in the B-pod segregation cell, and by failing to obtain any relevant medical records or documents or referring Hunter for psychiatric evaluation prior to making any decisions regarding Hunter.

The Court is not convinced a *substantial* risk of suicide could be reasonably inferred from the facts known to Martens. Hunter denied suicidal ideations in both of his interviews with Martens and appeared calm and relaxed during the December 22nd interview, which lasted more than 20 minutes. Even so, Martens must have not only been aware of facts from which the inference could be drawn that a substantial risk of suicide existed, but he must have also drawn the inference. There is no evidence Martens did so, and the facts known to him are not so obviously indicative of a suicide risk as to make Martens' action in clearing Hunter for B-pod placement deliberately indifferent. Where, as here, a qualified mental health professional assesses a detainee and finds no basis or cause to implement suicide prevention protocols, there can be no finding of deliberate indifference. *See Cox*, 800 F.3d at 1253 ("observable symptoms were susceptible to a number of interpretations; suicide may well have been one possibility, but the facts known to those with whom [inmate] interacted did not establish that is was a substantial one").

As with Sheriff Glick, supervisory liability against Defendant Wayne Graves must "be predicated on a violation traceable to [his] own individual actions." *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013). A plaintiff may succeed in a § 1983 suit against a defendant-supervisor by demonstrating: "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Id.* (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010)). *See also Cox*, 800 F.3d at 1248.

Graves had no personal interaction with Hunter or direct and contemporaneous knowledge of his treatment in December of 2015.[13] Nevertheless, Plaintiffs point out Graves supervised the mental health staff and was responsible for planning, managing, and delivering mental health services for LCDC inmates. Plaintiffs contend the requisite "affirmative link" is established by Graves allowing Martens to meet and assess inmates, without supervision, and to make decisions Martens was allegedly unqualified to make,[14] and also by Graves failing to include any psychiatrists or psychologists on the mental health staff or at least consult with any psychiatrist or psychologist when assessing

---

[13] Defendant Graves was on vacation in Germany from December 18-27, 2015 and was not present in the detention center during Hunter Johnson's detention. (Graves Dep. 32:17-33:6.)

[14] A provisionally licensed professional counselor is allowed to practice only under the supervision of a qualified clinical supervisor and in accordance with other restrictions specified by the Mental Health Professions Board. *See* WYO. STAT. § 33-38-106(d)((iv). The rules governing such supervision state: "Individual, triadic face-to-face clinical supervision and/or individual distance clinical supervision by a [qualified clinical supervisor] shall be provided monthly at a ratio of at least one (1) hour for every twenty (20) hours of direct clinical provision of services defined in this act." Current Rules & Regulations, Wyoming Mental Health Professions Board, Chapter 18: Supervision, Section 5(b) (eff. June 3, 2015), https://rules.wyo.gov/Search.aspx?Agency=078&Program=0001; *see also* Chapter 11: Licensed Professional Counselor, Section 4 (ECF No. 100-56).

suicidal inmates.[15]  Even so, Plaintiffs have failed to show how either of these factors

caused Hunter's suicide or that Graves acted with the constitutionally requisite

"particularized mental state" – i.e., that Graves had actual knowledge of *Hunter's*

substantial risk of suicide.  *Id*. at 1249.

### 3.   *Clearly Established Law*

Even were there some question whether Defendants violated Hunter's

constitutional right to medical care, the constitutional right was not "clearly established"

in the context of the particular conduct at issue here.   "A plaintiff may satisfy this

standard by identifying an on-point Supreme Court or published Tenth Circuit decision;

alternatively, the clearly established weight of authority from other courts must have

found the law to be as the plaintiff maintains."  *Quinn v. Young*, 780 F.3d 998, 1005 (10th

Cir. 2015) (internal quotation and citation omitted).  Plaintiffs frame the issue as follows:

"when there is evidence that an inmate is suicidal, the failure to take basic steps (such as

adequate monitoring) to prevent the suicide ordinarily constitutes a violation of a clearly

established constitutional right."  (Pls.' Opp'n to County Defs' Mot. for Summ. J. at 20-

21.)   Plaintiffs cite no Supreme Court or Tenth Circuit precedent in support of their

proposition; instead, Plaintiffs suggest a number of cases from other circuits place the

constitutional question beyond debate.  *See id*. at 20 & n.15.  While Plaintiffs are correct

they need not cite a "perfectly on-point" case (*Quinn*, 780 F.3d at 1005), Plaintiffs "must

---

[15] As noted above, there is no constitutional requirement that only licensed physicians or psychiatrists may conduct suicide evaluations; accordingly, it cannot be said Graves was deliberately indifferent to the risk of Hunter's suicide by permitting Martens – a provisionally licensed professional counselor with bachelor's degrees in psychology and sociology, a master's degree in clinical psychology, and ten years of related experience – to determine whether Hunter belonged on suicide watch.  *See Ernst*, 697 F. App'x at 934.

demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited," *Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1106 (10th Cir. 2014) (internal quotation marks and citation omitted).  This Plaintiffs do not, and cannot, do.

Plaintiffs merely offer a string cite of cases (all but one pre-dating 2015) without discussion of the particular facts of those cases.  None of those cases are factually similar, however, and support Plaintiffs' case here only to the extent they acknowledge the general constitutional right to be free from deliberate indifference to a substantial risk of suicide.  Tenth Circuit precedent teaches that merely asserting a clearly established "right to adequate medical care and to be free from deliberate indifference" does "virtually nothing to define the contours of the clearly-established-law question." *Cox*, 800 F.3d at 1245-46.  Rather, mindful of the Supreme Court's repeated admonition "not to define clearly established law at a high level of generality," *see supra*, the Court must consider whether, under the facts presented here, "then-extant clearly established law would have given [Defendants] fair warning" that their conduct would violate Hunter Johnson's constitutional rights.  *Cox*, 800 F.3d at 1245 n.6, 1247.  The Court concludes the right Plaintiffs' claim implicates here – an inmate's right to adequate suicide prevention protocols – was not clearly established in December 2015.  *See id*. at 1247.

Indeed, Supreme Court and Tenth Circuit precedent issued earlier in 2015 supports the Court's finding and suggests such a right did *not*, and does not, exist.  In addressing whether an inmate had a clearly established right "to the proper implementation of adequate suicide prevention protocols," the Supreme Court stated in June 2015: "No

decision of this Court establishes a right to the proper implementation of adequate suicide prevention protocols[;] [n]o decision of this Court even discusses suicide screening or prevention protocols." *Taylor v. Barkes,* 135 S. Ct. 2042, 2044 (2015).[16] Three months later, the Tenth Circuit Court of Appeals issued *Cox v. Glanz*, which the Court has cited repeatedly herein.

In *Cox*, the mother of a deceased jail inmate brought a § 1983 action against the county sheriff, relating to the inmate's suicide. 800 F.3d 1231 (10th Cir. Sept. 8, 2015). The district court denied qualified immunity to the sheriff. On appeal, the sheriff contended that extant caselaw at the time of the inmate's suicide did not clearly establish he could be held liable as a supervisor under the circumstances presented – i.e., where inmate denied having a suicidal intent during booking and no jail staff members detected a basis for referring him for additional mental-health screening based on their interactions with the inmate. *Id*. at 1236. The appellate court concluded the right implicated by the plaintiff's claim was "an inmate's right to proper prison suicide screening procedures during booking." *Id*. at 1247. Reversing the denial of qualified immunity, the appellate court found the then-extant clearly established law would *not* have put a jail administrator "similarly situated" to the sheriff on notice that he could be held liable under § 1983 based on a prisoner's suicide where "neither he nor any identified staff member whom he supervised possessed knowledge that the particular inmate who committed suicide

---

[16] Although in *Taylor* the Court was determining the existence of such a right in November 2004, the Court's statement is in the present tense and the Court makes no reference to any Supreme Court case post-2004 which established such a right. *See Powell v. Bd. of Cty. Comm'rs of Okla. Cty.*, No. CIV-18-294-D, 2019 WL 2238022, at *6 (W.D. Okla. May 23, 2019) ("To the extent Plaintiff predicates her constitutional claim on the failure of the BOCC to have in place suicide screening or prevention protocols at the OCDC, no such right has been recognized to be clearly established.") (citing *Taylor v. Barkes*).

presented a substantial risk of taking his own life." *Id*. at 1246. As here, the plaintiff in *Cox* failed to identify any Supreme Court or Tenth Circuit decision indicating this right was clearly established at the time of the inmate's suicide, nor had she attempted to show a clearly established weight of authority from other courts. *Id*. at 1247.

In reviewing the relevant case law, the court cited *Taylor v. Barkes* and noted that, as of November 2004, "a jail's nonexistent or deficient suicide-screening measures would not have necessarily indicated that an individual's prisoner's suicide was the product of deliberate indifference . . . ." *Id*. at 1250. The court determined the contours of the law in 2009 had not changed. *Id*. Plaintiffs point to no other case post-2009 holding a jail's deficient suicide prevention protocols, similar to the deficiencies alleged here, constituted deliberate indifference. Nor does *Cox* clearly establish such a right as the court did not address whether the defendant's conduct violated a constitutional right, instead focusing on the second prong of qualified immunity – whether the asserted right was clearly established. *Id*. at 1247. The Court concludes the clearly established law in December 2015 would not have put reasonable officials similarly situated to Defendants on notice that their conduct would violate Hunter's right to medical care. Accordingly, Plaintiffs have also failed to satisfy their burden on the clearly-established-law prong of the qualified immunity standard. Thus, the Defendants are entitled to qualified immunity.

**B.** *Negligence Claims*

The supplemental jurisdiction statute sets forth four factors the Court should consider in determining whether to exercise supplemental jurisdiction: "(1) the claim raises a novel or complex issue of State law; (2) the claim substantially predominates

over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). Here, the Court has determined Defendants' are entitled to qualified immunity, so Plaintiffs' § 1983 claim must be dismissed. "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."[17] *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (quoting *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998)). Further, Plaintiffs' negligence claim against Defendants Graves, Hansen, and Martens involves a somewhat novel issue of Wyoming law – that is, whether the waiver of immunity for health care providers under the Wyoming Governmental Claims Act applies to "social workers or counselors" such as these Defendants. (*See Order on Motions to Dismiss* at 20-22, ECF No. 69.) Therefore, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law negligence claims.

## CONCLUSION

For the reasons discussed above, the Court finds Defendants are entitled to qualified immunity on Plaintiffs' deliberate indifference claim under 42 U.S.C. § 1983.

---

[17] The Court is mindful of Plaintiffs' pending motion to amend their First Amended Complaint to re-allege their original official capacity/municipal liability claim and state law health care negligence claim. (*See* ECF No. 96.) However, the Court finds such an amendment would be futile. "A county or sheriff in his official capacity cannot be held 'liable for constitutional violations when there was no underlying constitutional violation by any of its officers.'" *Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009) (quoting *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317-18 (10th Cir. 2002)). Further, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law negligence claims.

And the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law negligence claims.  THEREFORE, it is hereby

ORDERED that *Defendants Laramie County, Wayne Graves, Glenna Hansen and Russell Martens' Motion for Summary Judgment* (ECF No. 92) and the *Individual Defendants' Motion for Summary Judgment* (ECF No. 94) are GRANTED IN PART AND DENIED IN PART.  Defendants are entitled to judgment as a matter of law on Plaintiffs' § 1983 claim; and Plaintiffs' negligence claims are DISMISSED WITHOUT PREJUDICE.  It is further

ORDERED that Plaintiffs' *Motion for Leave to Amend Complaint* (ECF No. 96) is DENIED.

Dated this 1st. day of August, 2019.

Scott W. Skavdahl
United States District Judge